IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JANICE ANDREOLI                    :               CIVIL ACTION
                                   :
        v.                         :
                                   :
DONALD RUMSFELD, Secretary of      :               NO. 03-6682
Defense, et al.                    :

O'NEILL, J.                                        OCTOBER 19, 2005

<u>MEMORANDUM</u>

Plaintiff, Janice Andreoli, filed a complaint on December 11, 2003 alleging that

defendants, Donald Rumsfeld, Secretary of Defense, and Vice Admiral Keith Lippert, Director of

the Defense Logistics Agency, violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e et seq., and the Rehabilitation Act of 1973, 29 U.S.C. §§ 706, 791-94, by engaging in

conduct that amounts to sexual harassment, discrimination, retaliation, hostile work environment,

and disability discrimination.  Plaintiff does not assert a claim for constructive discharge in her

complaint.  Defendants have filed an answer to plaintiff's complaint.  Before me now is

defendants' motion for summary judgment, plaintiff's response, defendants' reply, and plaintiff's

surreply.

BACKGROUND

Janice Andreoli is a civilian employee of the Defense Supply Center, Philadelphia

(DSCP).  She began her federal employment in 1986 with the Department of Defense and was

transferred to the DSCP in 1988.  Andreoli claims that between 1988 and 1989 a fellow

employee of the DSCP, Larry DeLutiis, verbally abused her by making sexually inappropriate

comments towards her, and about other women in her presence, when they were both working

1

the third shift (i.e. the night shift).  Andreoli found these comments to be highly offensive and unwelcome and told DeLutiis to stop.  In addition to making vulgar and inappropriate verbal remarks, Andreoli claims that DeLutiis rubbed up against her and at one point in 1989 tried to kiss her and put his hand between her legs.  DeLutiis denies these claims.

Andreoli claims that she complained to shift supervisors about DeLutiis' conduct, but that nothing was done until she spoke to a higher level supervisor, Division Chief Robert Olewink, during the first half of 1989.  After speaking with Olewink, DeLutiis was transferred to the first shift, but it took another five to eight months for him to be moved.  Olewink avers that he told Andreoli to let him know if the alleged harassment continued.  Olewink avers that Andreoli did not assert any further complaints with him before 1995, when he transferred to another position out of state.  In addition, Olewink avers that he denied DeLutiis' application to become a supervisor of Andreoli based in part upon Andreoli's allegations of sexual harassment.  As a result of this denial, DeLutiis filed a charge of reverse race discrimination with the Agency's EEO office because an African American female employee had been selected for the position.  In connection with that charge, Olewink asked and Andreoli agreed to provide an affidavit concerning her allegations of sexual harassment.  DeLutiis subsequently dropped his discrimination action in 1991.

Andreoli also claims that before and after DeLutiis was transferred out of the third shift, he spoke in a negative way about her and her work ethic to other employees (both supervisors and co-workers) on the third shift.  As a result of DeLutiis' comments, she claims that these other employees treated her poorly.  Specifically, she claims that her fellow employees sometimes refused to work with her and laughed at her.  Therefore, Andreoli asked to be moved to the

2

second shift.  Her request was granted and she was moved to the second shift in November or December 1990.  After DeLutiis was moved to the first shift and Andreoli was transferred to the second shift, Andreoli claims that DeLutiis would hang around where she arrived at work and signed in and continued to make offensive remarks to her and laugh at her.  Andreoli also claims that she was denied an award in 1990 as a result of DeLutiis allegedly speaking negatively about her to supervisors and other employees, who simultaneously would look over and laugh at her.

In 1996, Andreoli heard that DeLutiis had requested a transfer to the second shift, where she was now working.  She claims that she approached her supervisor, Robert Crawford, complained about the potential transfer, and explained her previous troubles with DeLutiis. Crawford allegedly told Andreoli that her troubles with DeLutiis were a long time ago and that she would get over it.  Not satisfied with this response, Andreoli claims that she approached her Division Chief (a higher level supervisor), Rosemary Badame, to complain about the potential transfer and explain her previous troubles with DeLutiis.  Following her conversations with Badame, DeLutiis was not moved to the second shift.

In 1997, Andreoli bid on a job as IT Specialist on the first shift (i.e. day shift), where DeLutiis was working.  She was selected and began work in June 1997.  In April 1998, the chair on which Andreoli was sitting at work collapsed and she suffered injuries to her neck, back, and shoulder.  She was unable to return to work until August 1998.  Also in 1998, Andreoli applied and was selected for a fellowship at Drexel University.  As a result of being awarded the fellowship, Andreoli was to attend college full-time and would only need to work at DSCP during breaks from school.  After she was awarded the fellowship, Andreoli claims that the supervisor of the first shift, Angela Vagnoni, changed her attitude towards her.  Andreoli claims

that she became hostile to her, screamed at her, and told her that she could not take Easter

Monday as a religious holiday.  Vagnoni allegedly also told her that she would not be promoted

to GS-11.  However, Andreoli claims that she was promoted to GS-11 four to six weeks later

than targeted with the promotion made retroactive to the target date.

Andreoli also claims that Vagnoni treated her differently because DeLutiis and another

employee, Ted DeSanto, said negative things about Andreoli to Vagnoni.  For example, Andreoli

claims that in December 1998 another employee, Carletha McEnnis, told Andreoli that Vagnoni

was hostile to her because DeLutiis and DeSanto were going into Vagnoni's office and saying

that Andreoli was not a good employee and that Andreoli faked falls every summer in order to

get out of work.

During this period of time, Andreoli did not seek counseling with the Agency's EEO

Office and did not file any charges or complaints of sexual harassment, discrimination, or

retaliation.  However, on February 1, 1999, Andreoli contacted the Agency EEO office to

complain that she was being discriminated against on the basis of sex and disability, and was

subjected to a hostile and retaliatory work environment.  Specifically, Andreoli alleged that:

> she feels discriminated [sic] because of her handicap (temporary physical job related
> injury), reprisal (served as a witness for RMO Robert Olewink in an EEO complaint
> (Lawrence Delutis [sic])[)] and sex (female) when on December 23, 1998, Carlitha [sic]
> McEnnis (co-worker) informed her that Angela Vagnoni (complainants [sic] immediate
> supervisor) was told by Lawrence Delutis [sic] and Theodore DeSanto that complainant
> has a pattern of faking falls so that she can get out of work every summer.  Therefore, she
> stated that this is one of the reasons why she was denied training classes and was not
> being promoted.  Complainant stated that she feels Mr. Delutis [sic] and Mr. DeSanto
> have been influencing management in holding her back from training and promotion
> opportunities because she served as a witness for Robert Olewink (rmo) in an EEO case
> filed by Lawrence Delutis [sic] in 1991 and 1992.  According to complainant, she is
> working in a hostile working environment with management retaliating against her
> because of her disability (temporary job injury), ongoing harassment, unequal terms and
> conditions of employment, limitation on upward mobility and ongoing denial of training

4

(Oracle classes).  Complainant went to the union on December 8, 1998 on promotion/denial of training issues, not on the issue of December 23, 1998.

For some time prior to 1999, Andreoli's mother was employed in the Agency's Human Resources/Personnel department.

Andreoli further claims that when she returned from her fellowship in the summer of 1999 she had to work in an alcove with the water cooler and copy machine.  She claims that DeLutiis frequently came into her alcove to get water at which point he brushed his leg against her.  For the period of months until she was assigned an appropriate work station, Andreoli's co-workers allegedly laughed at her and mocked her workstation.

On March 28, 2000, Andreoli filed her formal complaint of discrimination.  In addition to asserting allegations similar to those alleged in her initial interview with the Agency's EEO counselor, Andreoli also alleged in her formal complaint: (1) that she had been denied training opportunities; (2) that she did not have an appropriate work area; and (3) that she had been unfairly denied an award by her supervisor, Robert Marzzacco.  In this complaint, Andreoli did not allege that DeLutiis and DeSanto had made comments about her of a sexual nature; rather, that they had made untrue statements about her work ethic and work habits to her supervisors. Andreoli did not allege that DeLutiis or DeSanto made any false statements to Marzzacco or that false statements about her played any role in Marzzacco's decision to deny her an award or a satisfactory work space.  Andreoli does not allege that anyone other than DeLutiis sexually harassed her.

Between 1989--when she complained to supervisors about harassment by DeLutiis--and 2000--when she filed her formal charge of discrimination--Andreoli received numerous promotions and corresponding changes in grade level.  In October 1989, she was promoted from

5

GS-4 to GS-5.  Between 1993 and 1994, she was promoted from GS-5 to GS-7 as Team Leader

of the Second Shift because, as Andreoli claims, her supervisors noticed her work ethic.  In June

1997, she was promoted to Computer/Information Specialist.  In June 1998, she was promoted

from GS-7 to GS-9.  And, in July 1999, she was promoted from GS-9 to GS-11, with the

promotion made retroactive to June 1999.

Andreoli claims that in April 2000--shortly after she filed her formal complaint of

discrimination--and on three other occasions she thought that DeLutiis tried to run her over with

a government vehicle.  She alleges that twice in the Spring of 2000 DeLutiis purposefully

swerved a government van towards her as she was walking in the parking lot near her building in

an attempt to intimidate her.  After reporting these incidents to DeLutiis' supervisor, DeLutiis

was given a memo ordering him, inter alia, to stay away from Andreoli and to beep his horn if he

were driving near her on the base.  Andreoli also claims that on June 21, 2000 DeLutiis again

attempted to run her down with a government vehicle while she was outside the building where

she worked smoking in the company of her sister, Rosemary Tropea Talino, and another co-

worker, Daood Timazee.  DeLutiis allegedly pulled in quickly, startling Andreoli and her sister,

and stopping within one or two feet of where she was standing.  He did not beep his horn.

Following this incident, Andreoli was very upset and complained to her supervisors,

Marzzacco and Dudley Bolbat, and the security personnel.  On August 17, 2000, DeLutiis was

issued a traffic citation directing him to avoid any and all contact with Andreoli and an

investigation was conducted.  In the investigation, the Agency's detectives interviewed the

following individuals under oath: Andreoli; Talino; Timazee; DeLutiis; Kevin O'Donnell;

Dennis Davis; Ira Landau; Nancy Scarengille; and Phillip Trasatti.  Following a traffic court

hearing held at the DSCP facility in August 2000, DeLutiis was found not guilty of reckless driving by the naval officer who heard the testimony of various witnesses. Andreoli did not file a criminal complaint against DeLutiis for allegedly attempting to run her over. After this hearing, Andreoli stopped coming to work and sought the treatment of two psychiatrists, Drs. Heather Hall and Neil Schecker, for anxiety, depression, paranoia, and post traumatic stress disorder. She has been receiving workers compensation benefits since late 2000.

On December 19, 2000, Andreoli wrote her supervisor to request that she be allowed to work from 8:00 PM to 4:00 AM, so that she would not have to come into contact with DeLutiis. This request was denied allegedly because each of the employees with whom she would need to interact would not be at work during those hours and no one would be able to supervise her if she were working at night. When Andreoli was told in a telephone conversation with Bolbat on January 5, 2001 that the Agency could not accommodate her request, she asked the Agency to reconsider its position. Thereafter, on January 29, 2001, Andreoli filed an informal EEO complaint alleging failure by the Agency to accommodate her disability.

Andreoli was again notified by letter dated April 16, 2001 that the Agency could not accommodate her request to work the night shift. She was further asked to submit medical documentation to facilitate the Agency in finding potential accommodations. On May 18, 2001, Andreoli responded via counsel indicating that she would be able to work anywhere but on the same physical site as DeLutiis. The Agency continued to look for alternative positions and locations for her. However, the Agency could not identify any suitable assignments and notified Andreoli's counsel by letter dated June 1, 2001. Andreoli also completed her studies at Drexel University in 2001 and was awarded a Bachelor's degree.

7

Andreoli is not longer seeking to work in her previous career in computers and information technology. She is currently enrolled in a nursing program at a college near her home in Atlantic County, New Jersey.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2005). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions . . . which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). After the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (2005).

I must determine whether any genuine issue of material fact exists. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is material only if the dispute over the facts "might affect the outcome of the suit under the governing law." Id. In making this determination, I must view the facts in the light most favorable to the non-moving party, and the non-moving party is entitled to all reasonable inferences drawn from those facts. Id. However, the nonmoving party may not rest upon the mere allegations or denials of the party's pleading. See Celotex, 477 U.S. at 324. The non-moving party must raise "more than a

mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and

cannot survive by relying on unsupported assertions, conclusory allegations, mere suspicions.

Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  If the evidence for the

nonmoving party is merely colorable, or is not significantly probative, summary judgment may

be granted.  Anderson, 477 U.S. at 249-50 (citations omitted).

DISCUSSION

I.      Title VII

          Defendants argue that Andreoli's allegations do not constitute actionable claims of sex

discrimination, sexual harassment, hostile work environment or retaliation under Title VII

because: her claims of sexual harassment are untimely; she failed to raise her claims of sexual

harassment in her administrative filing; the alleged incidents with the government van do not

constitute sexual harassment, discrimination, or retaliation; the Agency acted reasonably in

response to her allegations of sexual harassment; and she has failed to state a claim for

retaliation.  Apparently, Andreoli is not pursuing her claims with respect to discrete acts of

harassment and discrimination but focuses her arguments on her hostile work environment and

retaliation claims.  Therefore, I will discuss only the parties' arguments with respect to

Andreoli's claims of hostile work environment and retaliation.[1]

--------

[1]Defendants also argue that Plaintiff's Exhibits A-H & J, attached to her response to defendants' motion for summary judgment are not admissible and, thus not reviewable by this Court, because each exhibit is irrelevant, would not be probative of any issue at trial, and constitutes inadmissible hearsay.  See Pamintuan v. Nanticoke Mem'l Hosp., 192 F.3d 378, 387 n. 13 (3d Cir. 1999) (holding that a reviewing court may only consider evidence that would be admissible at trial).  Because Andreoli fails to dispute this argument, I will not review these items of evidence here.

A.      Hostile Work Environment

1.      Limitations Period

Defendants first argue that Andreoli's claims of sexual harassment are untimely because defendants' alleged conduct took place fifteen years ago and Andreoli failed to file an administrative claim within forty five days of the alleged conduct.  A plaintiff in a Title VII action must "exhaust all required administrative remedies before bringing a claim for judicial relief."  Robinson v. Dalton, 107 F.3d 1018, 1020 (3d Cir. 1997); 29 U.S.C. § 794(a) (2005) (providing that Title VII procedures are applicable to claims under the Rehabilitation Act); Spence v. Straw, 54 F.3d 196, 200 (3d Cir. 1995) (same).  This rule is meant "to promote administrative efficiency, respect executive autonomy by allowing an agency the opportunity to correct its own errors, provide courts with the benefit of an agency's expertise, and serve judicial economy by having the administrative agency compile the factual record."  Robinson, 107 F.3d at 1020 (quotations omitted).

A federal employee must seek relief by contacting the EEO within forty five days of the alleged discriminatory event.  29 C.F.R. § 1614.105(a)(1) (2005);[2] Spence, 54 F.3d at 202. Andreoli did not seek EEO counseling until February 1, 1999--ten years after the alleged harassment by DeLutiis and nine years after Andreoli and DeLutiis originally were placed on

---

[2] 29 C.F.R. § 1614.105(a)(1) provides:

Aggrieved persons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age or handicap must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter.
An aggrieved person must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action.

separate shifts.  Thus, Andreoli's claims of discrete acts of harassment and discrimination that

predate December 17, 1998 are barred by Section 1614.105(a)(1)'s limitations period.

With respect to the alleged acts that predate December 17, 1998, Andreoli does not

dispute the applicability of Section 1614.105(a)(1).  She does not claim that she was not notified

of the applicable time limits or that she was not otherwise aware of them.  See 29 C.F.R. §

1614.105(a)(2).  She does not assert an argument for equitable tolling.[3]  She does not contend

that her claims were timely filed with the EEO Agency under the continuing violations doctrine.[4]

---

[3]Equitable tolling is generally only available in three circumstances: "(1) where the
defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the
plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3)
where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum."  Oshiver
v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1391-92 (3d Cir. 1994).

[4]The Court of Appeals has recognized the continuing violations doctrine as an equitable
exception to the timely filing requirement.

> [W]hen a defendant's conduct is part of a continuing practice, an action is timely
> so long as the last act evidencing the continuing practice falls within the limitations
> period; in such an instance, the court will grant relief for the earlier related acts that
> would otherwise be time barred.

> In order to benefit from the doctrine, a plaintiff must establish that the defendant's
> conduct is more than the occurrence of isolated or sporadic acts.  Regarding this inquiry,
> we have recognized that courts should consider at least three factors: (1) subject
> matter-whether the violations constitute the same type of discrimination, tending to
> connect them in a continuing violation; (2) frequency-whether the acts are recurring or
> more in the nature of isolated incidents; and (3) degree of permanence-whether the act
> had a degree of permanence which should trigger the plaintiff's awareness of and duty to
> assert his/her rights and whether the consequences of the act would continue even in the
> absence of a continuing intent to discriminate.  The consideration of "degree of
> permanence" is the most important of the factors.

Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (internal quotations and citations
omitted).  Andreoli argues that Morgan "ended the concept of a continuing violation."  However,
"nothing in Morgan supports that remarkable conclusion."  Shenkan v. Potter, 71 Fed. Appx.
893, 895 n. 3 (3d Cir. 2003) (holding that the district court did not abuse its discretion in
dismissing plaintiff's disability discrimination claim for failure to exhaust his administrative

Citing to <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101 (2002), however, Andreoli appears to argue that her allegations of misconduct that predate December 17, 1998 are timely and relevant to her hostile work environment claim because that claim encompasses all of defendants' alleged conduct, which she argues collectively constitute one unlawful employment practice.

With respect to Andreoli's hostile work environment claim, defendants argue that she fails to show that at least one act falls within Section 1614.105(a)(1)'s limitations period. The limitations period does not preclude me from reviewing some of the component acts of the hostile work environment claim that fall outside the limitations period. <u>See id.</u> at 117. "Provided that [one] act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." <u>Id.</u> Moreover, I am not limited to considering contributing acts that occurred within the forty five day period; I may also consider allegations of subsequent acts as part of the one hostile work environment claim. <u>See id.</u> Defendants identify one incident relating to Andreoli's claim of hostile work environment that may fall within the limitations period: Andreoli's claim that in December 1998 McEnnis told Andreoli that Vagnoni was hostile to her because DeLutiis

---

remedies because the continuing violations doctrine did not apply to make his claims timely). Rather, the Supreme Court in <u>Morgan</u> held that the continuing violation doctrine did not apply to discrete acts of discrimination and that a claim for failure to promote was a separate incident of discrimination that constituted a separate actionable unlawful employment practice. <u>Morgan</u>, 536 U.S. at 114. <u>But see</u> <u>Rotteveel v. Lockhead Martin Corp.</u>, No. 01-6969, 2003 WL 21956426, at *4 (E.D. Pa. July 11, 2003) ("[T]he Supreme Court specifically rejected the applicability of the continuing violation theory to claims of discrimination based on discrete acts. . . . The continuing violation theory remains viable as to claims of discrimination based on hostile work environment."); <u>McCarron v. British Telecom</u>, No. 00-6123, 2002 WL 1832843, at *11 (E.D. Pa. Aug. 7, 2002) (Green, J.) ("[T]he Supreme Court in <u>National R.R. Passenger Corp. v. Morgan</u> . . . recently rejected the continuing violations doctrine, holding that a plaintiff raising claims of discrete discriminatory acts must file his charge within the appropriate time period.").

and DeSanto were going into Vagnoni's office and saying that Andreoli was not a good employee and that Andreoli faked falls every summer in order to get out of work. However, defendants appear to argue that this conversation is inadmissible because: (1) it is irrelevant; (2) it is not probative of any issue; and (3) it constitutes inadmissible hearsay.

I disagree. This incident is relevant and probative because it suggests that two of Andreoli's coworkers had targeted her for disparate treatment and were acting to have her treated poorly by other employees. Cf. Fed. R. Evid. 401-03 (2005). This conversation is not inadmissible hearsay because each layer of this out of court statement is covered by the Rule 801(d)(2)(D) hearsay exclusion as "[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed. R. Evid. 801(d)(2)(D).[5] Because this statement falls within Section 1614.105(a)(1)'s limitations period, Andreoli has timely asserted her hostile work environment claim.

---

[5]Defendants further argue that "although plaintiff makes conclusory allegations of ongoing 'stalking' and sexual harassment by Mr. DeLutiis, plaintiff was not even working at defendant's facility during the 45 days prior to her meeting with the EEO counselor - she was away at college." Directing my attention to a string of emails by Andreoli to three other employees, Andreoli disputes this averment and claims that she did return to work for the period of December 15, 1998 through January 4, 1999. Although this creates an issue of fact as to whether Andreoli was at work during the forty five day period prior to her EEO meeting, this issue of fact is not material enough to preclude summary judgment.

2.     Severe, Pervasive and Regular

Defendants also appear to argue that the alleged harassment does not constitute a hostile work environment because the conversation between DeLutiis and McEnnis is not a part of the same unlawful employment practice allegedly perpetrated by DeLutiis and the conversation and related activity are not sufficiently severe, pervasive, or regular to alter the terms and conditions of Andreoli's employment.

A hostile work environment exists when the "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Morgan, 536 U.S. at 116 (internal quotations omitted).  A hostile work environment is thus characterized by the cumulative effect of repeated individual acts which may occur over a long period of time but which, taken alone, may not be actionable because each does not sufficiently affect the conditions of employment.  Id. at 115.  To establish her prima facie case for hostile work environment under Title VII, Andreoli must show: (1) that she suffered intentional discrimination because of her sex; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.  E.g., Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).  The parties only dispute elements (2) and (5).

The Supreme Court first recognized claims for hostile work environment sexual harassment under Title VII in Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986).  However, the Court emphasized that "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII."  Id. at

14

67.  Rather, "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. (internal quotations omitted).

Elaborating on this standard, the Court held in Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993), that to be actionable the work environment must be both objectively and subjectively offensive.

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Id. at 21-22.  In determining whether a work environment is objectively hostile, courts are required to examine "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 23.  Although the harassment need not be sexual in nature to be actionable under Title VII if it is based on the victim's gender or reflects retaliatory motives, Meritor Savings Bank, 477 U.S. at 65-66, the conduct at issue "must be extreme to amount to a change in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'"  Id. (internal citations omitted).

Between 1988, when Andreoli alleges that she was first harassed by DeLutiis, and 2000 when Andreoli ceased working at DSCP, Andreoli was allegedly subjected to the following forms of harassment: (1) DeLutiis made sexually inappropriate comments towards her and about

15

other women on one occasion in 1988; (2) DeLutiis rubbed up against her on one occasion in

1989; and (3) DeLutiis tried to kiss her and put his hand between her legs on one occasion in

1989; (4) DeLutiis frequently hung around where she worked to make offensive remarks at her

and laugh at her in 1990; (5) DeLutiis frequently brushed his leg against her in her alcove in

1999.  Andreoli claims that in connection with her refusing DeLutiis' advances and providing an

affidavit (with respect to her allegations of sexual harassment in connection with a charge by

DeLutiis that he suffered from reverse race discrimination because he was not selected for a

position) she was discriminated against and further harassed in the following ways: (a) DeLutiis

spoke in a negative way about her and her work ethic to other employees on numerous

unspecified occasions; (b) other employees generally treated her poorly, refused to work with her,

and laughed at her; (c) Andreoli was denied an award on one occasion in 1990; (d) her supervisor

was hostile to her on one occasion in 1998; (e) she was generally denied training opportunities;

(f) she was not afforded a proper work station in 1990; (g) her promotion was delayed in 1998;

(h) DeLutiis attempted to run her over with a government van on four occasions; (i) she was

denied her request to work a night shift; and (j) she was denied proper accommodations for her

impairment and issues with DeLutiis.

Viewing the evidence in the light most favorable to Andreoli, I find that there is a genuine

issue of material fact as to whether the alleged instances of sexual harassment and discrimination

were sufficiently pervasive and regular to constitute a hostile work environment.  "Incidents of

harassment are pervasive if they occur in concert or with regularity."  Cortes v. Univ. of

Medicine and Dentistry of N.J., No. 03-0312, 2005 WL 1076053, at * 5 (D.N.J. May 5, 2005);

Faragher, 524 U.S. at 787 n. 1 ("[I]ncidents of environmental sexual harassment must be more

than episodic; they must be sufficiently continuous and concerted in order to be deemed

16

pervasive.") (internal quotations omitted).

Andreoli alleges numerous episodes of harassment and discrimination over the course of her twelve years at the DSCP. A reasonable jury may find that such incidents were sufficiently continuous and regular as to create a hostile work environment. Thus, there is a genuine issue of material fact as to whether the alleged harassment pervaded her workspace so as to interfere unreasonably with her duties and the conditions of her employment. This conclusion is further supported by the severity of four of the alleged incidents of harassment and discrimination: DeLutiis' alleged attempts to run Andreoli down with a government van. As discussed above, isolated incidents of harassment may alter the conditions of one's employment and create a hostile working environment if they are "extremely serious." See Faragher, 524 U.S. at 788. Incidents of harassment are extremely serious if the harassment is physically threatening or intimidating. See Bonora v. UGI Utilities, Inc., No. 99-5539, 2000 WL 1539077, at *4 (Oct. 18, 2000). If Andreoli's allegations are found to be true, a reasonable jury may find that DeLutiis' alleged attempts to run over Andreoli with the government van was both physically threatening and intimidating.[6]

_____

[6]Defendants also argue that Andreoli's claims of discrete acts of sexual harassment that predate December 17, 1998 are barred because they were not raised in her administrative filing. See Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir. 1996) (holding that only those acts that are "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom" are considered to have been exhausted). I need not address this issue because Andreoli does not dispute this argument and I hold that Andreoli's claims of discrete acts of harassment that predate December 17, 1998 are barred by the limitations period.

With respect to the four discrete acts subsequent to December 17, 1998, which I found to be relevant to Andreoli's hostile work environment claim, defendants argue that DeLutiis' alleged attempts to run over Andreoli with the government van do not constitute sexual harassment because: "there is nothing to suggest that Mr. DeLutiis was driving the way he was because the plaintiff is a woman; giving the plaintiff the benefit of all reasonable inferences, her claim is that Mr. DeLutiis was attempting to threaten her for filing her EEO claim." I need not address this issue because Andreoli does not dispute this argument. As discussed above,

17

3.      Respondeat Superior Liability

Ultimately, defendants argue that Andreoli cannot establish respondeat superior liability because management at the DSCP acted reasonably with respect to Andreoli's claims.  "[W]hen the source of the alleged harassment is a co-worker, a plaintiff must demonstrate that the employer failed to provide a reasonable avenue for complaint, or, if the employer was aware of the alleged harassment, that it failed to take appropriate remedial action."  E.g., Weston v. Pennsylvania, 251 F.3d 420, 427 (3d Cir. 2001); Bonenberger v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997) ("[I]f the employer knew or should have known of the harassment and failed to take prompt remedial action, it is liable under Title VII"); Andrews, 895 F.2d at 1486 ("[I]f a plaintiff proves that management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment and failed to take prompt and adequate remedial action, the employer will be liable"); see also 29 C.F.R. § 1604.11 (2005) (providing that an employer is responsible for coworkers' acts of sexual harassment in the workplace "where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.").

Viewing the evidence in the light most favorable to Andreoli, I find that Andreoli has failed to establish respondeat superior liability.  The record shows, and neither party disputes, that defendants were aware of the alleged harassment.  However, Andreoli argues that defendants failed to take adequate remedial steps "to provide a workplace free of sexual harassment and free of a sexually hostile environment."  Although the Court of Appeals has held that "when an employer's response stops the harassment, there can be no employer liability under Title VII,"

---

Andreoli focuses her arguments exclusively on her claims of hostile work environment and retaliation.

Weston, 251 F.3d at 427; Bouton, 29, F.3d at 107 ("[P]rompt and effective action by the

employer will relieve it of liability"), Title VII does not require an adequate grievance procedure

actually to succeed in terminating sexual harassment.  Knabe v. The Boury Corp., 114 F.3d 407,

412 (3d Cir. 1997).  Rather, the grievance procedure need only be "reasonably calculated to

prevent further harassment."  Id. (rejecting the argument that an employer is liable unless it took

remedial action that was "actually effective" at stopping the harassment).  Therefore, an

employer-defendant may assert an affirmative defense by showing: (1) that it acted promptly and

reasonably to prevent and correct harassment; and (2) that the plaintiff unreasonably failed to

take advantage of the preventive opportunities or to avoid harm otherwise.  Omari v. Waste Gas

Fabricating Co., Inc., No. 04-0796, 2005 WL 545294, at *12 (E.D. Pa. Mar. 4, 2005) citing

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).

Defendants argue that after learning of each incident of DeLutiis' objectionable behavior,

management employees at the DSCP took prompt and adequate remedial action to terminate the

harassment and prevent further incidents.  I agree.  Defendants acted almost immediately after

learning of the alleged harassment in an attempt to remedy DeLutiis' objectionable behavior and

prevent any further harassment.  Although DeLutiis' initial transfer out of Andreoli's shift took

five to eight months to become effective, Andreoli does not allege that any incidents of

harassment took place during the period of time between her complaint and DeLutiis' transfer.

With respect to all other incidents of alleged harassment, management acted immediately in

remedying incidents of harassment alleged by Andreoli.

Although management's actions were not fully successful at deterring DeLutiis'

harassment, they were reasonably calculated to do so.  Management took the following actions to

remedy and prevent DeLutiis' alleged harassment: (1) when Andreoli complained of DeLutiis'

conduct in 1989, Olewink transferred DeLutiis to another shift away from Andreoli and told Andreoli to let him know if she experienced any more problems; (2) Olewink denied DeLutiis' application to become a supervisor of Andreoli because of her complaints; (3) in 1996, Badame refused DeLutiis' application to transfer to Andreoli's shift; and (4) when DeLutiis' allegedly attempted to run over Andreoli with a government van in 2000, DeLutiis' supervisors first ordered DeLutiis to stay away from Andreoli and to beep his horn if her were driving near her on the base, subsequently issued him a traffic citation directing him to avoid any all contact with Andreoli, and ultimately conducted an investigation into DeLutiis' driving behaviors, in which DeLutiis was found not guilty of reckless driving by the presiding naval officer.

From Andreoli's perspective, defendants no doubt could have done more to remedy the adverse effects of DeLutiis' conduct. However, it bears repeating that "Title VII requires only that the employer take steps reasonably likely to stop the harassment." Knabe, 114 F.3d at 414. Andreoli has presented no evidence that defendants could have pursued any other nonpunitive remedial action to stem DeLutiis' conduct. Andreoli appears to contend that DeLutiis should have been disciplined severely or terminated for his inappropriate conduct. However, "if the remedy chosen by the employer is adequate, an aggrieved employee cannot object to the selected action. Concomitantly, an employee cannot dictate that the employer select a certain remedial action." Id. Moreover, "taking punitive action against the harassing employee, e.g., reprimand, suspension or dismissal, is not necessary to insulate the employer from liability for a hostile work environment." Id. Here, management reasonably determined that such punitive action against DeLutiis was not appropriate in this case. The traffic hearing regarding DeLutiis' driving behavior found DeLutiis not guilty of reckless driving and Andreoli never pursued any official action, civil or criminal, against DeLutiis for his alleged actions. The fact that management did

not pursue punitive action against DeLutiis was therefore reasonable because "an employer might be faced with a lawsuit filed by the employee allegedly responsible for the harassment if the employer takes punitive action without ensuring that adequate grounds exist for the action." Id. at 414 n. 12.  So long as the remedy is reasonably calculated to prevent future instances of harassment, the employer cannot be held liable a respondeat superior theory of liability.  Id.

Furthermore, Andreoli unreasonably failed to take advantage of the preventive opportunities created by the DSCP for her to avoid further harassment by DeLutiis.  Notably, in 1997, Andreoli bid on and was selected for a job as IT Specialist on the very shift where DeLutiis then worked and had been transferred in order to accommodate Andreoli as a result of her previous claims of harassment.  It is during her stint on this shift that Andreoli alleges that DeLutiis frequently came into her alcove and brushed up against her and that he attempted to run her over with a government van on four occasions.  An employer-defendant cannot be held liable on a respondeat superior theory of liability where an employee-plaintiff affirmatively places herself in a position of close contact with her alleged harasser.  Because Andreoli has failed to establish respondeat superior liability, summary judgment will be granted with respect to Andreoli's hostile work environment claim.

B.      Retaliation

It is an unlawful employment practice for an employer to discriminate against an employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a) (2005).  In McDonnell Douglas Corp. v. Green, the Supreme Court created the basic framework and burdens of proof in Title VII pretext actions.  411 U.S. 792 (1973).  Andreoli must first establish a prima facie case of discrimination by a preponderance of the evidence.  Id. at 802.  "To establish a

prima facie case of retaliation, a plaintiff must show that: (1) he or she engaged in a protected

employee activity; (2) the employer took an adverse employment action after or

contemporaneous with the protected activity; and (3) a causal link exists between the protected

activity and the adverse action." Weston, 251 F.3d at 430.

Andreoli appears to assert that she was retaliated against for: (1) providing an affidavit to

Olewink in connection with DeLutiis' EEO claim of reverse race discrimination; (2) lodging an

informal complaint with the Agency EEO office in 1999 alleging that she was being

discriminated against on the basis fo sex and disability and subject to a hostile and retaliatory

work environment; and (3) filing her formal EEO complaint in 2000 further alleging that she had

been denied training opportunities, an appropriate work area, and an award.  Defendants do not

dispute that Andreoli engaged in protected employment activities, but rather argue that Andreoli

has failed to establish her prima facie case for retaliation because Andreoli was not subjected to

an adverse employment action.

Retaliatory conduct is considered an adverse employment action if it causes "a significant

change in employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in benefits."

Burlington Indus., 524 U.S. at 761.  In order to rise to the level of adverse employment action,

the retaliatory conduct "must be serious and tangible enough to alter an employee's

compensation, terms, conditions, or privileges of employment."  Robinson, 120 F.3d at 1300.

However, "not everything that makes an employee unhappy qualifies as retaliation, for otherwise,

minor and even trivial employment actions that an irritable chip-on-the-shoulder employee did

not like would form the basis of a discrimination suit."  Robinson, 120 F.3d at 1300 (internal

quotations omitted).

22

Defendants argue that Andreoli's claims--(a) that she was denied an award, (b) that she was denied a scheduled promotion, (c) that she lacked an appropriate work area when she returned from her fellowship at Drexel, (d) that she was denied equal training opportunities, (e) that she had unequal advancement opportunities compared to male coworkers, (f) that she was mistreated by her coworkers--do not rise to the level of adverse employment actions.  See, e.g., Weston, 251 F.3d at 431; Robinson, 120 F.3d at 1300-01 (holding that allegations of "unsubstantiated oral reprimands" and "unnecessary derogatory comments" following complaint did not rise to the level of adverse employment action); Gagnon v. Sprint Corp, 284 F.3d 839, 850 ("[O]stracism and rudeness by supervisors and coworkers do not rise to the level of an adverse employment action.").  However, Andreoli appears to argue that she suffered an adverse employment action because she was constructively discharged from her employment at the DSCP as a result of the alleged hostile work environment.

In order to assert a claim of constructive discharge, Andreoli must show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984).  In other words, Andreoli must show that the conditions of her employment were so objectively intolerable that a reasonable person in the same position would feel compelled to resign.  Connors v. Franklin Fin. Corp., 160 F.3d 971, 976 (3d Cir. 1998).

Even assuming that Andreoli was constructively discharged, however, she has failed to establish--or even argue--that the constructive discharge was causally connected to her protected employment activity.  See Robinson, 120 F.3d at 1302 ("[T]he mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.").  Defendants further argue that

23

even if Andreoli established her prima facie case, she has failed to rebut management's

legitimate nondiscriminatory reasons for their actions.  See Woodson v. Scott Paper Co.,109 F.3d

913 (3d Cir. 1997).  Andreoli fails to dispute both of these arguments.  Because Andreoli has

failed to establish her prima facie case for discriminatory retaliation, summary judgment will be

granted with respect to Andreoli's retaliation claim.

II.      Rehabilitation Act

A.      Disability

          Defendants argue that Andreoli is not disabled as a matter of law because she is not a

qualified individual under the Rehabilitation Act.  To establish a prima facie case of

discrimination under the Rehabilitation Act, a plaintiff must prove "(1) that he or she has a

disability, (2) that he or she is otherwise qualified to perform the essential functions of the job,

with or without reasonable accommodations by the employer; and (3) that he or she was

nonetheless terminated or otherwise prevented from performing the job."  Shiring v. Runyon, 90

F.3d 827, 831 (3d Cir. 1996).  A person has a disability within the meaning of the Rehabilitation

Act when that person has "(i) a physical or mental impairment which substantially limits one or

more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is

regarded as having such an impairment."  29 U.S.C. § 705(20)(B) (2005); Toyota Motor Mfg. v.

Williams, 534 U.S. 184, 193 (2002).  Andreoli appears to argue that she has an impairment

because DeLutiis' conduct allegedly has caused her to suffer severe depression and posttraumatic

stress disorder.  Andreoli does not appear to argue that she has a record of impairment or is

regarded as having an impairment.

          Initially, I note that the Supreme Court has held that merely providing evidence of a

medical diagnosis of an impairment is insufficient to prove disability.  Toyota, 534 U.S. at 198.

24

Disability is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12111(2) (2005); Toyota, 534 U.S. at 193.  The Court of Appeals explained that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."  Gigliardo v. Connaught Labs., Inc., 311 F.3d 565, 569 (3d Cir. 2002) quoting Toyota, 534 U.S. at 198.

Andreoli argues that her work related depression and posttraumatic stress disorder substantially limit her major life activities in that she is precluded from working, thinking, concentrating, and interacting with others.  Andreoli appears to argue that her alleged disability prevented her from caring for her youngest child "at times," which she contends is a task of central importance to most people's daily lives.  However, "[t]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities."  Holmes v. Pizza Hut of Am., Inc., No. 97-4967, 1998 WL 564433, at *4 n. 5 (E.D. Pa. Aug. 31, 1998) quoting 29 C.F.R. pt. 1630 app., § 1630.2(j) (2005).  Therefore, Andreoli's testimony that she was "at times" unable to care for her child does not establish that she is prevented or severely restricted from that activity.

Defendants argue that Andreoli does not suffer a disability because her alleged impairment does not substantially impact a major life activity.  Defendants further argue that Andreoli does not allege that she cannot work, but only that she cannot work in the vicinity of DeLutiis.  Defendants contend that this does not constitute an impairment of the major life activity of working because Andreoli's impairment must preclude her from a broad class of jobs.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999) ("When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a

25

minimum, that plaintiff[] allege [she is] unable to work in a broad class of jobs."). Defendants

note that Andreoli was able to get married, finish her college degree, and was enrolled in a

nursing degree program. Defendants appear to argue that she would not be able to engage in

those activities if she has a qualifying disability.

I agree. Andreoli does not assert that she is precluded from a broad class of jobs. See

Sutton, 527 U.S. at 492; Holmes, 1998 WL 564433, at *4 n. 6 ("For an impairment to

substantially limit one's ability to work, it must not merely prevent one from working a particular

job; it must prevent one from working at a class of jobs or a broad range of jobs in various

classes."). Generally, a plaintiff asserting "that she has an impairment that substantially limits

her ability to work . . . must present demographic evidence to show what jobs in her geographic

area she has been excluded from due to her disability." Holmes, 1998 WL 564433, at *4 n.6

(internal quotations omitted). A reasonable jury could not find that Andreoli is precluded from

working at a class of jobs or a broad range of jobs when she asserted she could work anywhere

except in the proximity of DeLutiis. See Gonzagowski v. Windall, 115 F.3d 744, 746-47 (10th

Cir. 1997) (denying summary judgment to employee whose alleged impairments were limited to

and arose out of specific stressful work situations); Holmes, 1998 WL 564433, at *4 n.6 ("The

inability to perform a single, particular job does not constitute a substantial limitation in the

major life activity of working.") quoting 29 C.F.R. § 1630.2(j)(3)(i) (2005). A reasonable jury

could not find that Andreoli is substantially impaired in performing major life activities of

working, thinking, concentrating, or interacting with others when she was able to get married,

finish her bachelors degree, and attend nursing school. Being a wife and being a student requires

thinking, concentrating and interacting with others.  Viewing the evidence in the light most favorable to Andreoli, I find that Andreoli has failed to establish a qualifying disability under the Rehabilitation Act.

B.      Reasonable Accommodation

Defendants argue that they did not fail to accommodate because Andreoli does not have a qualifying disability, and even if she did, Andreoli's requested accommodation is unreasonable as a matter of law.  Because I find that Andreoli has failed to establish that she has a disability, I need not address whether her requested accommodations were unreasonable.

Defendants' motion for summary judgment will be granted.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JANICE ANDREOLI | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DONALD RUMSFELD, Secretary of | : | NO. 03-6682 |
| Defense, et al. | : | |

<u>ORDER</u>

AND NOW, this 19th day of October 2005, upon consideration of defendants' motion for summary judgment, plaintiff's response, defendants' reply, plaintiff's surreply, and for the reasons set forth in the accompanying memorandum, it is ORDERED that defendant's motion for summary judgment is GRANTED.  Judgment is entered in favor of defendants, Donald Rumsfeld, Secretary of Defense, and Vice Admiral Keith Lippert, Director of the Defense Logistics Agency, and against plaintiff, Janice Andreoli.

s/ Thomas N. O'Neill, Jr.
THOMAS N. O'NEILL, JR., J.